# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NORTHEASTERN DIVISION

KIMBERLY K. COLEMAN,      )
                                   )

        **Plaintiff,**        )

                                   )     **Civil Action No. 2:07-0043**
      **v.**                       )     **Judge Nixon / Knowles**

                                   )

**MICHAEL J. ASTRUE,**        )
**Commissioner of Social Security,**   )

                                 )

        **Defendant.**      )

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security which found that Plaintiff was not disabled and which denied Plaintiff Disability Insurance Benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"). The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket Entry No. 23. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No. 27. Plaintiff has filed a Reply. Docket Entry No. 28.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record should be GRANTED, and that this case should be REMANDED.

## I. INTRODUCTION

Plaintiff filed her application for Disability Insurance Benefits on February 21, 2003,

1

alleging that she had been disabled since May 13, 2002, due to cervical disc herniation, degenerative disc disease, migraine headaches, and depression. *See, e.g.,* Docket Entry No. 16, Attachment ("TR"), pp. 31, 45, 54, 63. After Plaintiff's application was denied initially (TR 45), Plaintiff requested (TR 50-51) and received (TR 39, 197-224) a hearing. Plaintiff's hearing was conducted on November 16, 2004, by Administrative Law Judge ("ALJ") Eduardo Soto. TR 197. Plaintiff and Vocational Expert, James Friedlob, appeared and testified. *Id.*

On July 14, 2005, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 30-37. Specifically, the ALJ made the following findings of fact:

1. The claimant meets the disability insured status requirements of the Act at least through the date of this decision.

2. The claimant has not engaged in substantial activity since May 13, 2002.

3. The claimant has "severe" impairments, as described in the decision, but does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's subjective complaints are not fully credible.

5. The claimant has the residual functional capacity to perform a full range of unskilled light work activity.

6. The claimant is unable to perform any past relevant work and has no transferable work skills.

7. The claimant is 43 years old, which is defined as a younger individual.

8. The claimant has more than a high school education.

9. Based on an exertional capacity for light work and the

2

claimant's age, education, and work experience, 20 C.F.R.
§ 404.1569, and Rule 202.21, Appendix 2, Subpart P,
Regulations No. 4 direct a conclusion of "not disabled."

10. The claimant has not been under a "disability," as defined
in the Social Security Act, at any time through the date of
this decision.

TR 36-37.

On September 06, 2005, Plaintiff requested review of the hearing decision. TR 22-24.

On March 29, 2007, Plaintiff timely filed a letter again requesting review of the hearing decision.

TR 14-15. On March 30, 2007, the Appeals Council issued a letter declining to review the case

(TR 11-13), thereby rendering the decision of the ALJ the final decision of the Commissioner.

This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g).

If the Commissioner's findings are supported by substantial evidence, based upon the record as a

whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

### A. Medical Evidence

Plaintiff alleges disability due to cervical disc herniation, degenerative disc disease,

migraine headaches, and depression. *See, e.g.,* TR 31, 45, 54, 63.

Plaintiff visited the Battle Creek Health System's emergency room on May 30, 2002,

with complaints of neck pain, intrascapular pain, and right shoulder pain radiating down her right

arm, with paresthesia in the second, third, and fourth fingers of the right hand. TR 31. While

there, Plaintiff underwent a cervical spine MRI, which revealed C3-4 and C5-6 disc herniation

with right C6 nerve root compression. TR 133.

On July 8, 2002, Plaintiff visited neurosurgeon Dr. Michael G. Hughes because of the

3

onset of pain in May 2002; specifically, Plaintiff complained of neck pain, intrascapular pain, pain in her right shoulder and down her right arm with paresthesia in her second, third, and fourth finger, paresthesia down her left arm, and an ache in her right leg. TR 122. Upon examination, Dr. Hughes noted an impaired range of motion in Plaintiff's neck with flexion and extension with reproduction of neck pain and some of the right arm symptoms, as well as mild pain in the right shoulder with active and passive range of motion. TR 121. Dr. Hughes further noted that Plaintiff's upper extremities showed a normal range of motion and strength, good pulses, a normal motor examination, symmetrical reflexes, and unremarkable inspection and palpation, with no atrophy, no fasciculation, a negative Hoffman's sign, no sensory deficit, and no joint tenderness. *Id.* Dr. Hughes' examination of Plaintiff's lower extremities revealed normal individual muscle testing, 1+ knee and ankle reflexes, good distal pulses, good hip range of motion without tenderness, and a normal sacroiliac joint, sensory responses, spinal alignment, and gait, with no swelling, tenderness, atrophy, fasciculation, winging, or trigger point, and negative straight leg raising. *Id.*

Dr. Hughes also reviewed Plaintiff's MRI, which revealed a disc herniation at C5-6 with bilateral neuroforaminal narrowing and minimal bulging at C3-4. TR 121. Dr. Hughes' impression was cervical radiculopathy with pain, numbness, and impaired range of motion in Plaintiff's neck, but without motor, sensory, or vascular deficit. TR 121-122. Dr. Hughes scheduled surgery. *Id.*

On August 12, 2002, Dr. Hughes stated in a progress note that he no longer felt comfortable managing Plaintiff's pain medication. TR 119.

On August 30, 2002, Dr. Hughes performed Plaintiff's anterior cervical discectomy, with

4

decompression, allograft, and stabilization with fusion due to a cervical spondylosis with a herniated cervical disc C5-6 that produced a cervical radiculopathy. TR 102-104. Plaintiff's allergy to Codine was noted, and Plaintiff was discharged from the hospital with considerable improvement of her symptoms and with no neurological deficits. TR 103-104.

On September 4, 2002, Dr. Hughes noted that Plaintiff had some posterocervical and medial scapular pain and had a definite trigger point in the medial scapula on the right side, but had no neurological deficit. TR 118. Dr. Hughes stated that Plaintiff was taking Duragesic for pain, but that he did not plan to refill the prescription. *Id.*

On September 11, 2002, Dr. Hughes opined that Plaintiff was experiencing Oxycontin withdrawal. TR 117. He further opined that Plaintiff would benefit from the use of a TENS unit and he referred Plaintiff to Dr. Herman Schmidt for medication for post Oxycontin withdrawal and somatic pain. *Id.* He continued Plaintiff's Duragesic and Vicodin, and prescribed Elavil. *Id.* On October 9, 2002, Dr. Hughes noted that Plaintiff had had a long time use of Oxycontin presurgery. TR 116. Plaintiff received x-rays, which demonstrated excellent post-surgical alignment of the anterocervical allograft, plate, and screw. *Id.* Dr. Hughes noted that Plaintiff had no neurogodical deficit and that her neck incision appeared clean and healed. *Id.* Dr. Hughes opined that Plaintiff was having somatic pain secondary to not receiving Oxycontin. *Id.* Dr. Hughes referred Plaintiff for an MRI for her neck, massage therapy, evaluation for a shoulder syndrome by Mr. Muzljakovich, and to Dr. Schmidt for help with medication for post Oxycontin withdrawal and somatic pain. *Id.* Dr. Hughes gave Plaintiff Elavil, but no further narcotics. *Id.*

On October 21, 2002, Plaintiff underwent a cervical spine MRI, which revealed intact

5

alignment of the cervical spine, maintained vertebral body and disc height, resolution of the disc herniation at C3-4, minimal (but not significant) spondylotic changes, minimal right neural foraminal stenosis at C4-5, and resolution of the herniated disc and central canal stenosis at C5-6. TR 129.

On October 23, 2002, Plaintiff visited Dr. Hughes for a follow-up examination. TR 115-116. Dr. Hughes stated that Plaintiff's MRI of the neck showed good alignment and no neurocompression. TR 115. Dr. Hughes noted that Plaintiff had not seen Dr. Schmidt for pain management as he had recommended, and had not taken her prescribed Elavil. TR 115. Dr. Hughes also noted that Plaintiff had been taking Oxycontin "in large doses" before surgery and he wondered if the residual pain was caused by medication withdrawal. *Id.* Dr. Hughes reported that Plaintiff had been going to physical therapy, but complained of shoulder pain and pain down her arm. TR 115-116. He noted Plaintiff's pain in her shoulder on active and passive range of motion. TR 115. Dr. Hughes referred Plaintiff to orthopedics for evaluation of her shoulder, continued physical therapy, and follow-up with him. *Id.* Dr. Hughes also discontinued Plaintiff's pain medication. *Id.*

On November 25, 2002, Dr. Hughes noted that Plaintiff was experiencing shoulder symptoms, including diffuse neck pain and intrascapular pain. TR 114. Dr. Hughes also noted that he would like Plaintiff to see a physiatrist for possible pain management if covered by Plaintiff's insurance because Plaintiff's only medication at that time was Aspirin. *Id.* Dr. Hughes further noted that, despite Plaintiff's cervical spine decompression and fusion, Plaintiff continued to have somatic pain without neurological deficit. *Id.* Dr. Hughes noted that Plaintiff would also need a neurology consultation because of her headaches. *Id.*

6

On December 4, 2002, Plaintiff consulted neurologist B. Douglas Campbell, for complaints of headaches and left eyelid drooping. TR 138-139.[1] Plaintiff reported that her headaches had begun approximately two weeks after her discectomy, and that she had been taking eight to ten Excedrin daily to help suppress the pain. TR 139. Dr. Campbell noted that he would prescribe Pamelor if Plaintiff continued to have headaches. TR 138.

On December 16, 2002, Plaintiff underwent an MRI of her brain, with special attention being given to the orbits. TR 127. The results of Plaintiff's MRI were normal. *Id.*

On February 5, 2003, Plaintiff returned to Dr. Campbell, who noted that her eye symptoms had resolved, but that her headaches had continued and increased such that they were occurring on a daily basis. TR 134. Dr. Campbell noted that Plaintiff had called the office on December 6, 2002, because of her headaches and she had been prescribed Compazine, which was later changed to Phrenilin; Plaintiff's Pamelor dosage had also been increased. *Id.* Plaintiff reported that she had stopped taking her medication and continued to complain of neck and subscapular pain, as well as difficulty sleeping. *Id.* Dr. Campbell opined that Plaintiff had not taken those medications long enough to determine their effectiveness, and he instructed her to restart the Pamelor, and to take Bextra and Riboflavin. *Id.*

Plaintiff visited Dr. Seth Egelston on April 3, 2003, for complaints of neck pain, back pain, right arm pain, insomnia, and right lower extremity pain and numbness. TR 158. Dr. Egelston noted muscle strength of 4/5 in Plaintiff's right lower extremity, tenderness of the right shoulder, and a positive Spurling's response on the right. *Id.* He also noted diminished sensation of the right lower extremity and positive straight leg raising in the seated and supine

---

[1] The second page of the consultation note is missing.

positions.  *Id.*  Dr. Egelston prescribed Ultram and Skelaxin.  *Id.*

Plaintiff continued to see Dr. Egelston for pain in May and June 2003.  TR 147-151.  In June, 2003, Dr. Egelston diagnosed right upper extremity radiculopathy and low back pain with right lower extremity radicular pain.  *Id.*  Plaintiff reported no pain relief with Ultram, and that Skelaxin caused diarrhea and stomach cramping.  TR 151.  Dr. Egelston prescribed Plaintiff Vicodin, but she reported that it also failed to provide relief.  TR 147-151.

A June 9, 2003, Physical Residual Functional Capacity Assessment indicated that Plaintiff could perform light work with limitation to occasional use of bilateral hand controls, occasional bilateral reaching, occasional use of ramp or stairs, never using a ladder, rope, or scaffold, and no concentrated exposure to vibration.  TR 163-166.

On July 9, 2003, Dr. Egelston reviewed an MRI of Plaintiff's lumbar spine, which indicated mild facet joint disease without neural impingement.  TR 143-144.  Dr. Egelston diagnosed myofascial pain syndrome, and prescribed Pamelor and Vicodin.  *Id.*  Plaintiff's EMG and nerve conduction testing returned normal results.  TR 145.

On October 9, 2003, Plaintiff visited Dr. John A. Milcu for her ongoing cervical pain, limitation of motion, and restless sleep.[2]  TR 161.  She reported that trigger point injections had only aggravated her pain, and that the medication had only provided temporary relief, and Dr. Milcu discussed referring Plaintiff to the pain clinic.  *Id.*

On October 23, 2003, Plaintiff returned to Dr. Egelston for back pain.  TR 140.  Upon examination, Dr. Egelston noted that Plaintiff had cervical-thoracic muscle spasm and pain.  TR 141.  Plaintiff also had negative straight leg raising.  *Id.*  Dr. Egelston diagnosed Plaintiff with

---

[2] Dr. Milcu is board certified in physical medicine and rehabilitation.  TR 161.

8

cervical-thoracic myofascial pain and lumbosacral pain dysfunction, and he prescribed Vicodin. TR 140.

On December 12, 2003, Dr. Milcu noted that Plaintiff had not been referred to the pain clinic because she had moved to another state; however, Plaintiff had continued to have pain. TR 160. Dr. Milcu also noted that he had discontinued Plaintiff's Oxycontin because of "concerns," but that it had worked better than the Vicodin that Plaintiff was then taking. TR 160. Dr. Milcu found that Plaintiff had a slightly reduced cervical range of motion, but no tenderness, and he reported that Plaintiff was neurologically intact, had 5/5 motor strength in her upper and lower extremities, and deep tendon responses of 2+ , with normal sensation. *Id.* Dr. Milcu adjusted Plaintiff's medication, and again referred her to a pain center for medication management. *Id.*

On December 19, 2003, Plaintiff again reported to Dr. Milcu that the Vicodin had not been working well, and Dr. Milcu arranged for Plaintiff to have an appointment in the pain clinic the following month. TR 159.

On February 9, 2004, Plaintiff commenced treatment at the Pain Management Group with Dr. W. Stephen Long, Dr. Kenneth W. Sullivan, and Dr. Jeffrey York. TR 170-182. Plaintiff reported having headaches, neck pain, left upper extremity pain, mid back pain, lower back pain, right lower extremity pain, numbness and paresthesias in her right hand and fingers and right toes, which prevented getting good sleep, doing home chores, walking, exercising, and being employed. TR 182. On a scale of one to ten, with ten being the worst, Plaintiff reported that her pain was an eight at best and a ten at worst. *Id.* Plaintiff's then-current medications were Vicodin and Restoril, but Vicodin was reportedly "not very helpful." *Id.* Plaintiff received x-

9

rays of her cervical and lumbar spine, which demonstrated decreased intervertebral disc height at the remaining cervical disc, decreased disc height at L5-S1, increased facet hypertrophy involving L3 through S1, anterior spurs at L2-3, and possibly bony spurs into the neural foramina in the L5-S1 nerve area. TR 179.

Dr. Long examined Plaintiff on February 9, 2004, and noted equal and normal bilateral temperature and pulses of her extremities, and no clubbing cyanosis, or edema. TR 180-182. Dr. Long further noted Plaintiff's intact sensation in all extremities, deep tendon responses of 1+/4 bilaterally in the upper extremities and bilateral patellae and trace in the bilateral Achilles tendons, as well as her erect posture, steady gait ambulation, and negative bilateral straight leg raises. *Id.* Dr. Long also noted that Plaintiff's cervical and lumbar spine was tender to palpation, with a decreased range of motion. *Id.* His impression was cervical and lumbar degenerative disc disease, cervical and lumbar radiculopathy, and lumbar spondylosis. *Id.* Dr. Long prescribed Lortab, Zanaflex, and Gabitril. *Id.*

Dr. York gave Plaintiff a cervical epidural injection on March 2, 2004, and Plaintiff continued to receive treatment for pain and medication management through April, 2004. TR 176-178.

On April 5, 2004, a CT scan of Plaintiff's lumbar spine demonstrated posterior spurring at L5-S1 displacing the S1 nerve root and some degenerative disc disease at the L2-3 level, but no evidence of disc protrusion. TR 175. Another cervical epidural steroid injection was given on May 4, 2004. TR 174.

In June 2004, Dr. York found that Plaintiff had 5/5 muscle strength bilaterally in the upper and lower extremities and deep tendon responses of 2+/4 bilaterally in the upper and lower

10

extremities. TR 173. Dr. York further found that Plaintiff had erect posture and ambulated with a steady gait. *Id.* Dr. York diagnosed Plaintiff with degenerative disc disease, cervical and lumbar radiculopathy, and spondylosis, and he adjusted Plaintiff's medications. *Id.*

On June 1, 2004, Plaintiff categorized her pain for Dr. Sullivan as a ten out of ten without medication and an eight and a half out of ten with pain medication. TR 173. Plaintiff complained that the pain medication caused drowsiness, however, even though it allowed her to sleep better. *Id.* Dr. Sullivan had been prescribing Kadian, Lortab, Gabitril, and Zanaflex. *Id.* Dr. Sullivan decreased Plaintiff's Gabitril and added Keppra. *Id.* Dr. Sullivan reviewed Plaintiff's CT results and noted that Plaintiff's cervical spine was very tender to light palpitation. *Id.* He further noted that Plaintiff had a depressed affect. *Id.*

Plaintiff continued receiving treatment for her headaches and pain through August 2004. TR 170-171.

As discussed above, Plaintiff's hearing before the ALJ in this case occurred on November 16, 2004.

On November 19, 2004, Dr. Sullivan stated that Plaintiff's only reported medication side effect was drowsiness, which he noted was consistent with Plaintiff's medications and chronic pain. TR 184. He further noted that depression was associated with Plaintiff's chronic pain and he continued to recommend a functional capacity evaluation to determine Plaintiff's physical capabilities. TR 184.

On May 7, 2005, Plaintiff underwent a consultative examination with orthopedist Dr. Michael Delan Gaines. TR 188-191. Dr. Gaines found that Plaintiff would not cooperate with moving her neck in any direction, and noted that she asserted that all movement hurt. TR 189.

11

Upon examination, Dr. Gaines found that Plaintiff had full flexion, although she stated that she had tenderness throughout her neck and lumbar spine. *Id.* Dr. Gaines stated that it was difficult to get Plaintiff to cooperate with range of motion in her bilateral upper and lower extremities, but although "sluggish," it appeared to be full. TR 189-190. He found that Plaintiff had 5/5 strength throughout her upper and lower extremities, despite Plaintiff's giving minimal cooperation. *Id.* He further found that Plaintiff had intact sensation and symmetric 1+ reflexes in her upper and lower extremities, that there were no Hoffman or Babinski signs, that she had a normal gait, and that she could heel and toe walk and squat. *Id.* He observed that Plaintiff had been tender to palpation throughout her central lumbar spine, her paraspinals, her iliac crests, greater trochanters, PSIS, and sciatic notches. TR 189. Dr. Gaines reviewed all of Plaintiff's medical records, including objective studies. TR 190. Dr. Gaines concluded that Plaintiff's pain was not related to any nerve involvement; however he opined that "she may have a significant portion of her pain and disability related to non-organic causes," and that treatment for her depressed affect might improve her pain. *Id.*

Dr. Gaines completed a Medical Source Statement of Ability to Do Work-Related Activities, in which he opined that Plaintiff could perform light work with additional limitations in pulling and pushing with both the upper and lower extremities, could never perform any postural activities such as climbing, balancing, kneeling, crouching, crawling, and stooping, and should have limited exposure to vibration. TR 192-195.

### B. Plaintiff's Testimony

Plaintiff was born on May 1, 1962, and has a high school diploma and an associate's degree in auto technology. TR 202.

The ALJ began the hearing by inquiring about the fact that Plaintiff's earnings in 2002 were almost double her earnings in 2001, even though Plaintiff worked less than six months in 2002. TR 199. Plaintiff explained that she "was probably paid a higher wage, as well as being in a higher position and more overtime pay as well." TR 200. Plaintiff also acknowledged that she had received accrued vacation pay when she stopped working in May of 2002. *Id.* Plaintiff further acknowledged that both short and long term disability benefits might have contributed as well, and she testified that she had filed a worker's compensation claim which had been denied. TR 200-201.

Plaintiff testified that she had initially stopped working on May 13, 2002, but that she had returned to work from June 3 through June 11. She had to stop, however, because it was "unbearable to work." TR 201. Plaintiff testified that, during her return to work from June 3 through June 11, she had "returned to full duty without restrictions," and had "tried to complete [her] tasks, as best [she] could." TR 201-202.

Plaintiff reported that she had been in the Air Force "from August through February" when she was seventeen. TR 202-203. Plaintiff explained that she had been too young to enter the Air Force program that she had entered, and that the Air Force found out and offered her the choice to receive an honorable discharge or go into "female police officering." TR 203. Plaintiff reported that she chose to take the honorable discharge. *Id.*

Plaintiff testified that she had been able to apply the skills that she had learned obtaining her associate's degree to light industrial field work and to production work in a factory. TR 202.

With regard to her past relevant vocational history, Plaintiff testified that, in the fifteen years prior to her hearing, she had worked in automotive assembly, in hands-on work

13

mechanically in the light industrial field, "in a lot of union environment workshops," making small parts, and being a machine operator. TR 203-204. Plaintiff testified that those positions had required her to stand on her feet "most of the day." TR 204. Plaintiff further testified that those jobs had required her to lift between ten and seventy-five or eighty pounds. *Id.* Plaintiff clarified that she only lifted the heavier weights occasionally, and that her the typical weight that she would have to lift during the day would be around forty pounds. *Id.*

Plaintiff testified that she had also worked "constructing seats" for recreational vehicles, semi trucks, and businesses. TR 205.

From 1999 through 2001, Plaintiff worked as an assembly team leader for Marshall Brass in Marshall, Michigan. TR 205. As the assembly team leader, Plaintiff reported that she had been responsible for assigning job duties and had had to complete "reports, production reports, [and] quality reports." *Id.* Plaintiff explained that she had also been the "problem solver working closely with management," and that, "it was a union shop, so there was a lot of litigation and problems on that type of a scale that was dealt with... management." TR 206. Plaintiff also reported that she would sometimes have to work the floor as a production worker herself. *Id.*

Plaintiff testified that she had worked for a cereal company, Ralston Foods, as a millwright and machine operator before she stopped working in 2002. TR 206. Plaintiff added that she had been shifted to a different position with "about double the pay raise," which is what explained the difference in wages from 2001 to 2002. Plaintiff reported that that job had required her to be on her feet "constantly" doing "strenuous work." *Id.* Plaintiff explained that she "would have to push like 'farmal tanks' that weighed up to a thousand pounds when full,

14

loading tractors moving it from one area to the next to be packaged of bulk cereal." TR 207-208. Plaintiff stated that she had become injured pushing the "farmal tanks" over a "warped floor." TR 208.

Plaintiff testified that, after she had become injured, she underwent an MRI of her cervical spine on May 30, that revealed disc herniation at C3-4 and C6. TR 208-209. As noted above, Plaintiff returned to full duty work for about a week. TR 209.

Plaintiff reported that she had undergone physical therapy as part of her treatment plan, and that she had undergone an anterior cervical diskectomy and decompression on August 30, 2002 "to correct the problem." TR 209. Plaintiff reported, however, that the surgery had not been successful. TR 210. She testified that her condition had remained "the same" post surgery, and she explained that she had continued to experience numbness and radiating pain in her right arm and headaches. TR 211. Plaintiff added that "there's talk of more surgery," but noted that she had been "trying injections and things" because she was not looking forward to another surgery. *Id.*

Plaintiff reported that she began seeing Dr. Hughes approximately one month following her surgery, in September of 2002. TR 210. She further reported that she had been prescribed Oxycontin, but that the Oxycontin had not been effective in relieving her pain, and that her last visit to Dr. Hughes had been in November of 2002. *Id.*

Plaintiff asked the ALJ if she could stand for a while because the chair was "hard." TR 210.

Plaintiff acknowledged that, after being treated by Dr. Hughes, she went to Dr. Campbell a "couple of times," then to Dr. Egleston, and then to "Dr. Melcoo." TR 211-212. "Dr. Melcoo"

15

administered "onsite injections" in Plaintiff's neck, which were not effective. TR 211. He then suggested epidural injections which would be "more precise to the site of the nerves." TR 212.

Plaintiff reported that she had moved from Michigan to Tennessee in 2003, partially because "Dr. Melcoo" had felt that moving to a warmer climate could help her with her "bone and muscle problems," partially because of the economy, and partially because she had family in Tennessee. TR 212-213. Plaintiff acknowledged living with her half-sister in Tennessee, but reported that she had lived alone in a house in Michigan, which she had been unable to maintain because she could not mow the grass or carry things. TR 213. Plaintiff estimated that her move to Tennessee had reduced her pain by approximately thirty percent. TR 214. She explained that moving to Tennessee had alleviated a lot of the pain because she did not have to do as many chores and duties, and was therefore able to concentrate more on taking care of her pain problems. *Id.*

With regard to helping out around the house, Plaintiff testified, "occasionally, I do what I can, not at a high rate of speed, by any means." TR 214. Plaintiff reported that she did "a few dishes," but noted that she had a dishwasher. *Id.*

Plaintiff reported that her pain was in her neck, arms, and shoulders, but radiated down her both of her legs. TR 214-215. She described her pain as constant, numbing, and sharp. TR 214. She noted that her right arm and hand was numb and would tingle and was cold, and that she would experience a shooting pain that would go up her arm. TR 215. Plaintiff testified that she could load a plate or cups into the dishwasher, but that she would have to use both hands when using her right hand to make sure that she did not drop whatever she was carrying in her right hand. TR 216.

16

On a scale of one to ten, with ten being the most severe, Plaintiff rated her pain as an eight, even with medication. TR 216. Plaintiff testified that she had been taking morphine based "Acadian" since she moved to Tennessee in November of 2003. *Id.* Plaintiff further testified that she had attempted to stop taking pain medication in the past, but that when she did that, the pain was "unbearable." TR 217. Plaintiff testified that without taking the narcotic based medication her pain was a ten, but that with taking the narcotic based medication, and with meditation and deep breathing exercises, her pain was reduced to an eight. *Id.* Plaintiff reported that she also read "a lot of self-help books" to help her cope with the pain and her attendant anger and resentment, and to help her "keep [her] hopes up." *Id.*

Plaintiff testified that the side effects she experienced from taking her narcotic based medication were cloudy thoughts and fatigue. TR 217. Plaintiff reported that she would have to "take naps quite often," but that she could only sleep approximately two hours at a time before her pain would wake her up. TR 217-218.

When asked to describe the emotional effects of her situation, Plaintiff reported that she was "pretty depressed," that she had changed "quite a bit,"and that she cried "a lot." TR 218-219.

The ALJ asked Plaintiff why her workers' compensation claim had been denied. TR 222. Plaintiff reported that she did not know why her claim had been denied, just that it had been denied. *Id.* Plaintiff reported that she had begun receiving short term disability benefits "immediately, about a week after" she stopped working in June. TR 222-223. Plaintiff also reported that, as of the time of the hearing, she continued to receive long term disability benefits. TR 222.

The ALJ asked Plaintiff which of her physicians was "signing off" on her long term disability. TR 223. Plaintiff responded that she did not know who was "signing off" on that. *Id.* The ALJ then asked Plaintiff whether she ever received forms from the insurance company that she was to have a physician complete; Plaintiff responded that she had not received any such forms. *Id.*

### C.  Vocational Testimony

Vocational Expert ("VE"), James Friedlob, also testified at Plaintiff's hearing. TR 224. With regard to Plaintiff's past relevant work history, the VE classified Plaintiff's past relevant work as a food service worker as medium and semi-skilled, her past relevant work in automotive assembly as light and semi-skilled, her past relevant work in mechanical assembly as medium and semi-skilled, and her past relevant work as a team leader as medium and semi-skilled. *Id.*

The ALJ asked the VE to consider "a section from DDS at 7F." TR 224. The VE responded that that Exhibit "would limit [Plaintiff] to a full range of light work." *Id.* The ALJ was evidently referring to Exhibit 7F, a "Physical Residual Functional Capacity Assessment," apparently completed by "CATHY UR EE," and dated 6/9/03. TR 162-169. Exhibit 7F, under "Postural Limitations," states that Plaintiff could occasionally perform stooping, kneeling, crouching, and crawling, that she could frequently perform balancing, that she could occasionally perform climbing of ramps or stairs, but that she could never perform climbing of ladders, ropes, or scaffolds. TR 164.

As discussed above, the Medical Source Statement Of Ability To Do Work-Related Activities (Physical), completed by Dr. Gaines, under "Postural Limitations," states that Plaintiff could *never* perform climbing (of ramps, stairs, ladders, ropes, or scaffolds), balancing, kneeling,

crouching, crawling, or stooping. TR 193. It is important to note that Dr. Gaines' statement is

dated May 8, 2005, approximately six months after Plaintiff's hearing was held. Thus, the VE's

testimony was based entirely upon Exhibit 7F; the VE could not consider Dr. Gaines' findings

because Dr. Gaines had not yet made those findings.

The ALJ asked the VE whether Plaintiff's testimony would preclude all work, and the

VE responded affirmatively. TR 224.


### III.  CONCLUSIONS OF LAW

### A.  Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the

administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The

purpose of this review is to determine (1) whether substantial evidence exists in the record to

support the Commissioner's decision, and (2) whether any legal errors were committed in the

process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept

as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999)

(*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been

further quantified as "more than a mere scintilla of evidence, but less than a preponderance."

*Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v.*

*N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner

if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*,

745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner, however, did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

### B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step

sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[3] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.
>
> (5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule.

---

[3]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C. Plaintiff's Statement Of Errors

Plaintiff contends that the "ALJ's decision should be reversed because it is not supported by substantial evidence, the ALJ's residual functional capacity ("RFC") determination is erroneous, the ALJ failed to properly assess Plaintiff's mental RFC, the ALJ failed to consider Plaintiff's headaches, and the ALJ's credibility determination is erroneous." Docket Entry No. 22. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can

be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

Plaintiff argues that the ALJ's RFC determination was erroneous because it relied upon the VE's answer to a hypothetical question that did not include Plaintiff's credited non-exertional limitations, including her postural limitations. Docket Entry No. 22. As discussed above, however, the only postural limitations in the record at the time of Plaintiff's hearing were those set forth in Exhibit 7F. Thus, the ALJ did not err in regard to the hypothetical question.

It was, however, incumbent upon the ALJ to discuss, in his decision, Dr. Gaines' findings with regard to Plaintiff's postural limitations. The ALJ's decision discusses in some detail the consultative orthopedic evaluation performed by Dr. Gaines.[4] The ALJ's decision states in part:

> I have considered the opinion of physical functioning provided by the consultative examiner, Dr. Gaines: "With her physical exam findings and the results of her physical examination, I have no reason to conclude that any of her pains in her extremities and in her back that she complains of are due to any nerve involvement. It appears that she may have a significant portion of her pain and disability related to non-organic causes." Dr. Gaines further opined that the claimant can lift/carry 25 pounds occasionally and 20 pounds frequently, and would be limited in pushing and pulling with upper and lower extremities, but her sitting, and standing and/or walking are unaffected by her impairments. Dr. Gaines had the benefit of reviewing much of the medical record and personally

---

[4] The ALJ's decision was issued July 14, 2005, approximately two months after Dr. Gaines' evaluation occurred.

23

examining the claimant.  His opinion is supported by the overall record and is consistent with the opinion of the State Agency review expert, which I have also considered.  Thus, I afford Dr. Gaines' opinion of physical functioning considerable weight, and I find the claimant's impairments would allow for light work activity.

TR 35 (citation omitted).

Even though the ALJ gave Dr. Gaines' opinion "considerable weight," he completely failed to discuss Dr. Gaines' findings with regard to Plaintiff's postural limitations.  This fact is very significant, because those findings were contrary to the findings concerning Plaintiff's procedural limitations discussed in Exhibit 7F.  The ALJ's statement that Dr. Gaines' opinion "is consistent with the opinion of the State Agency review expert" is simply incorrect, at least with regard to postural limitations.

Moreover, the complete inability to perform postural activities is inconsistent with the ability to perform either light or sedentary work.  Light work requires the ability to stoop "occasionally" due to the lifting requirement.  SSR 83-10.  "Occasionally" is defined as "occurring from very little up to one-third of the time."  *Id.*  SSR 83-14 further provides that, "to perform substantially all of the exertional requirements of most sedentary and light jobs, a person would not need to crouch and would need to stoop only occasionally . . . ."

The undersigned cannot discern whether the ALJ accepted, rejected, or simply overlooked Dr. Gaines' postural limitations for Plaintiff.  Those postural limitations are inconsistent with the ALJ's determination that Plaintiff retained the RFC for the full range of unskilled light work.  If the ALJ rejected Dr. Gaines' procedural limitations as not credible, he was required to state the reasons for doing so.  The ALJ must identify the reasons and basis for crediting or rejecting certain items of evidence (*see, e.g., Morehead Marine Services v.*

24

*Washnock*, 135 F.3d 366, 375 (6th Cir. 1998); *Hurst*, 753 F.2d at 519), as there can be no meaningful judicial review without an adequate explanation of the factual and legal bases for the ALJ's decision (*Hyatt Corp. v. N.L.R.B.,* 939 F.2d 361, 367 (6th Cir. 1991)). Because the ALJ did not discuss his reasons for accepting or rejecting Dr. Gaines' postural limitations, the undersigned is unable to determine whether substantial evidence supported the ALJ's RFC determination. Accordingly, remand is warranted.

Because remand is warranted on these grounds, the undersigned will not address the remainder of Plaintiff's statements of error.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record should be GRANTED, and that this case should be REMANDED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in this Report in which to file any response to said objections. Failure to file specific objections within ten (10) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

_____
E. CLIFTON KNOWLES
United States Magistrate Judge

25

26